Thank you, Judge Wardlaw, and may it please the Court, my name is Mark Caldwell. I'm representing Mr. Palmer this morning in this social security case. I will keep track of my own time, but with the Court's permission, I'm going to try to reserve five minutes for rebuttal. There are two main issues in this case. One is the medical opinion evidence, and the second is the claimant credibility determination. On the second, I'm just going to mention that the district court took it upon itself to change the standard of review from specific, clear, and convincing to merely specific, citing an unpublished district court case from California. I think the district court stepped outside its bounds on that ground alone, which, from my point of view, virtually mandated an appeal. That said — I understand. But it's the standard under which the de novo review occurs that I think is important. But I think the prior issue is the more determinative one, and that regards the medical opinion evidence. And, of course, here we have medical opinion evidence from three treating physicians, Dr. Kuruvilla, Dr. Porter, and Dr. Adiyankar. Dr. Kuruvilla was the primary care doctor, and he gave an assessment at 5.55, and the vocational expert testified that if you have those limitations, you can't work at 5.79. Dr. Porter gave two assessments. One was a physical capacities assessment, sitting, standing, walking, et cetera, and that one was kind of iffy. The vocational expert said, well, that's right on the borderline of not being sedentary. But on its face, it was less than sedentary because it was less than six hours of sitting. By definition, that's not sedentary work. But it really doesn't make any difference because then Dr. Porter gave an assessment regarding the pain that would reasonably be expected from the impairments that Mr. Palmer suffered from, and the vocational expert said those limitations would preclude any work. And then, finally, we have Dr. Adiyankar. Dr. Adiyankar was the treating psychiatrist, and the ALJ decision does not mention Dr. Adiyankar at all, yet the vocational expert testified that the assessments by Dr. Adiyankar at 3.61 would preclude any work activity at 5.98. So the question becomes, did the ALJ provide the requisite reasons for rejecting all three treating physician assessments? Roberts. But can we assume that he rejected Adiyankar when he didn't say anything at all? Does that mean that he rejected him? In Garrison, this Court said if you ignore evidence, you have effectively rejected it. Rejected it. Yes. But then doesn't he have to offer some reasons? Your Honor, I'm sorry. Doesn't he have to offer some reasons, a basis for not considering the evidence of a treating physician? He should have, but when he didn't, that means he rejected it. And when he rejected it without sufficient reasons, under Lester and very many other cases from this Court, that evidence should be credited as a matter of law. When that evidence is credited as a matter of law and coupled with the vocational expert testimony, that those limitations would preclude the ability to sustain any work, and an ALJ would be required to enter a finding of disability. And that's not just true of Dr. Adiyankar. That's true of Dr. Porter and Dr. Kuruvilla as well. So Adiyankar, he didn't consider it at all. Didn't mention it. He doesn't mention it. He may have read it, but he doesn't say. Well, it's interesting the way you say that, because the district court had a rationale that I vehemently disagree with, that the ALJ said, well, I've considered the evidence as a whole, and therefore he must have considered Adiyankar. In that case, if that's sufficient, then an ALJ decision can just say, I've looked at the record and the claimant's disabled signature. I understand that that's not good, that, you know, our case law seems to say that if, you know, they don't address it, it's material here. If they don't address it, then, as Judge Wardlaw said, or you said, you know, it's like they rejected it. Yes, sir. And they got to give reasons to do that, and they didn't here. That's correct. So, okay. So that's Adiyankar. So Kuruvilla, you know, he does address Kuruvilla. He does. And in his report, he says, well, it's incongruent with all the other medical evidence. And that's all he says. Why isn't that good enough? Because we don't know what he's talking about. Well, he says Porter. Doesn't he say Porter was more positive than Kuruvilla? Actually, yes. He actually says that he is giving Dr. Porter's assessment significant weight. He can only do that by doing two things. One, by ignoring the pain assessment from Dr. Porter because the vocational expert said that those assessed limitations would preclude any sustained work. And two, by interpreting what Dr. Porter said in a way that Dr. Porter did not state. Dr. Porter stated that there would be at least two but less than six hours of standing or walking. So we have no idea what that means. Does that mean two plus one minute? Or does that mean six minus one minute? And then he said less than six hours of sitting. So that can add up to a variety of different numbers. But the point is, on its face, it's for less than sedentary work because sedentary work, as defined by the Commissioner in Ruling 8515, states that sedentary work requires the ability to sit six hours out of an eight-hour day. So you can say that you are giving weight to a piece of evidence, but if you're actually misconstruing the evidence and then ignoring another part of the same doctor's opinion, then you can't say that that supports the ALJ decision. So with Porter — so with respect to Porter, he accepted part of Porter's assessment and rejected the other part, the pain part. Is that what happened? I've got to be a little careful in my answer here. He purports to accept part of what Dr. Porter says. The physical capacity assessment, which I've been just saying to Judge Wardlaw, is a warped interpretation of what that says. But, yes, he purports to accept that. But then he — I'm sorry. He outright rejects the pain. I'm sorry, Judge Wardlaw. That's what I'm trying to understand. He rejected the pain. But how can he — I mean, if he — wait. What I don't understand is if you have all this physical stuff that is likely to create these symptoms that ultimately cause pain, how can you accept one part of that report, like the physical problems, and not the result from those physical problems? Here I stand. You can. So what the ALJ did do, though, was he gave a lot of credit to Dr. Geary and Dr. Garland. Okay. Dr. Geary, if I remember correctly, was a psychologist. Correct, an examining one-time psychologist. Right. The problem — now we're switching from physical to mental, which I'm happy to do. The problem with Dr. Geary is Dr. Geary gave no assessment of the work capacities that would arise from the diagnoses and findings that he gave. His report, I thought, was extremely powerful. This man has anxiety that's verging on panic, et cetera, et cetera. But he did not give any more assessments. Did he make any assessments of the pain? Well, that is an interpretation that the commissioner is — and I think the district court was using to say that there is a conflict in the evidence, because the physical doctors talked about pain and the psychologists gave limitations, and the interpretation that the agency is urging is that the limitations secondary to pain were mental impairments. No, they're not. Dr. Geary's diagnosis, I believe, was major depressive disorder, post-traumatic disorder, and those were the diagnoses upon which he gave a limited opinion. That's not the same at all, not even close to what Dr. Porter and Dr. Caravia did in terms of saying here are the limitations secondary to pain. Now, I won't argue that there isn't some interrelationship between pain and mental impairments. That's the Lester case and several others. But there is no way to say that these were two completely intertwined assessments. They simply were not. The doctors were looking at two things, apples and oranges. As to Dr. Gardner, that's a — I have a very simple answer on that one. If you're trying to rest an agency decision on solely the opinion of a non-examining state agency physician, this Court has said over and over and over again that that is not substantial evidence. I've got a whole list in my brief that I won't bore you with. I see I'm coming up on some time. May I reserve? Yes, you may. Thank you. Thank you. May it please the Court. Excuse me. My name is Mark Thain Warner on behalf of the Commissioner. Your Honors, this case, really the timeline as far as the psychological limitations is a very important part of this case, and I feel that Mr. Caldwell probably hasn't addressed that very well. In this case, the claimant, Mr. Palmer, said that he stopped using drugs on or around December 2007. And afterwards, it's clear that he had some mental or psychological problems that declined over time. In fact, by July 2008, his doctor, Dr. Abianker, had reduced his limitations from or had reduced his diagnosis from major depressive disorder and PTSD to dysthymia instead. So now, I might have this completely wrong, but from my review of this record, this is a person who was a bus driver who had experienced back problems in the past, and then there was some sort of an accident where his seat broke down and that exacerbated. Is that right? I think that evidence was far in the past. Well, before December 2007, he hadn't actually worked for quite a while. He hadn't. But apparently, he thought that whatever was going wrong with his back was exacerbated by this defect in the seat. Your Honor, I guess I'm not aware of that. And I guess if that is in the record, it's... Well, I guess, another way of putting that question, what was your understanding of what was the genesis of his back problems? Your Honor, it seems like he was stating... Can you just come on one day? I mean, you know, you wake up one day, oh, my back. No. I can't move. It seems like he was stating that the back problem was a result of some kind of accident, but it was in the distant past. Right. I think that's what Judge Wardlaw is getting at. Yeah. Okay. He was working with back pain, but then he had an accident and then it got worse. And then I guess he wasn't working. Right. That seems to – that follows my recollection of the record, Your Honor. You're right. It's pretty clear from the record, at least when you read Dr. Geary's report, that Mr. Palmer had a long, long period of time when he was addicted to, you know... To pretty hard drugs. Right. And, in fact, his doctor seems to point to that as contributing to his psychological problems. Right. And said he can't work for a year because of this. That's what she said in December 2007. But by July 2008, she no longer said that. She said, well, I think he's actually not able to work because of his back problems. She made no mention of being unable to work due to mental problems. Okay. The drugs, though, they were all painkillers, pretty heavy painkillers? No, Your Honor. I believe it was either methamphetamine and heroin or just heroin. It was drug abuse, not treatment? It was illegal drugs, yes. Okay. And what generated the post-traumatic stress disorder? You know, Your Honor, I don't know just from the record before us, but she – but Dr. Abiancar clearly diagnosed him with PTSD. Right. And I'm not – it doesn't really – it's not really clear what it's from. No. No, Your Honor. I agree. Of course, Mr. Caldwell stated that, well, because the ALJ didn't discuss Dr. Abiancar, then he rejected it. But that's not accurately – doesn't accurately account for the record. The ALJ actually pointed to Dr. Abiancar's treatment notes. We know that Dr. – that the ALJ considered Dr. Abiancar's – the notes from Dr. Abiancar. And that's on page 41 of the excerpts of the record. And he points to Exhibit 15, which is the notes from Dr. Abiancar. Now, clearly the ALJ should have discussed Dr. Abiancar's opinion in this record. So that was something the ALJ should have done but didn't do. But the court – This is what – I'm sorry. The district court tried to explain away the ALJ's failure to carefully address Abiancar's opinion. Right. And I don't find any of the district court's reasons persuasive because we look at what the ALJ did. That's our review. Our review is of the ALJ's decision. But the harmless error standard necessarily – That gets into this whole, well, we're speculating on how the ALJ would have viewed her opinion in light of all the other evidence. Right. And the case that Mr. Caldo brought to the Court's attention, the Marsh case in the supplemental authority that he filed, actually discussed this as well and says that the nature of the harmless inquiry is actually fact-intensive and the Court has to analyze the effect of that error in light of the entire record as a whole. So the mere fact that the ALJ didn't discuss Dr. Abiancar's opinion isn't the end of the case or the end of the inquiry. The Court needs to look at the facts of the case to determine whether that would steer, whether that error actually harmed the claimant. And in this case – But I had the impression that when Abiancar's assessment was brought to the attention of the expert, the vocad expert, that for her that would have made it, if you give any kind of credit to her opinion, that would have made an important difference. Right. And I think it would have. However, we need to, again, look at the facts of the case. Over the 7-month period, Dr. Abiancar went from saying he's completely unable to work because of his mental limitations to, by I believe July 2008, that there were a few remaining effects that were limiting. But then when we get to Mr. Palmer's testimony, the ALJ said, what are the problems mentally that are stopping you from being able to work? And he said, well, I can't really be around the public and I don't read and write very well. Well, the ALJ explicitly accounted for the limitations that Palmer stated he had in the residual functional capacity assessment and limited him based on those. So the facts of the case taken as a whole show that Palmer, although he had some residual difficulties and some pretty strong difficulties immediately following his cessation of hard drug use, he improved over time, over the two-and-a-half-year period of this case, by his own admission during his testimony before the ALJ. I think I found why he has post-traumatic stress disorder. It's in Dr. Geary's report. And he said that Kenneth admitted he was involved in gangs in Detroit and on a number of occasions witnessed associates murdered and had guns pointed at himself. And then he described a number of those symptoms, which Dr. Geary seems to accept. Right. And Dr. Geary's assessment was, again, in April 2008. This would be shortly after the cessation of drug use. And, in fact, Dr. Geary's report shows that Palmer had improved from the initial report given by Dr. Albianca in December 2007, where she listed a lot of significant mental effects. By the time we get to Dr. Albianca's and Dr. Geary's reports later in the middle part of 2008, it shows that he's actually improved. And then, of course, like I said, by the time he testifies, he's saying that he doesn't even need his depression or he hasn't even taken his depression medication anymore, which the ALJ concludes that means he must not need it because he's saying, well, I only really have three difficulties. It's I can't be around the public or I can't be around a lot of people, and I have a hard time reading and writing. He also said, Dr. Geary also said he had intellectual, borderline intellectual dysfunction. Right, Your Honor. I think that goes along with Palmer's testimony. They had a hard time reading and writing. And I think the ALJ, I don't think that's in dispute in this case. I think the ALJ recognized that and said, okay, but I'm limiting him to performing simple work, to unskilled work. Abi Yonkers, you said that Abi Yonkers' assessment changed, and it's reflected in her notes? In her notes and in the opinion she gave. And which document, if you just have the ER number. I do, Your Honor. So the initial one, the stronger opinions by her of disability are at 247 to 52, and on, yeah, 247 to 52, and on 290, that's in December 2007 and January 2008. The reduction in, I'm sorry, on 347, that's April 2008, she is no longer diagnosing him with major depressive disorder or PTSD, and now she's assessing him with dysthymia. What date is that? I'm looking at the 2007. April 2008, Your Honor. Okay. And then on page 347. And then she assesses him in July 2008. She says he can't work due to his back problems. She makes no mention of not being able to work due to mental problems. That's on 349. And, in fact, that same day she fills out a form, a medical source statement, 361 to 62 in the record, where she limits him in a couple of three areas, but not in the majority of the areas listed. She limits him pretty strongly. Your Honor, if you have no more questions on that, I'd like to turn to a discussion of Dr. Kouroubila's and Dr. Porter's opinions, the physical problems, if that's acceptable. Okay. Thank you. Your Honor, Mr. Kouroubila stated that Dr. Geary, I'm sorry, that the ALJ ignored the pain assessment by Dr. Palmer. That's not correct at all. The ALJ made sense of Dr. Porter's pain assessment. Dr. Porter stated that, although Palmer had some residual effects from his pain that might affect his concentration, he said those would not preclude work. But then he also said that they would be frequent. So the ALJ actually looked at the entirety of that pain assessment. Mr. Cole is asking you to just look at a couple of the responses that he gave and conclude that that means that he was disabled on a frequent basis. But I would suggest to the Court that reading the entire pain assessment as a whole shows that the ALJ took that pain assessment and made some sense of it. And then turning to Dr. Porter's medical source statement, I think Mr. Acaldo has conceded that Dr. Porter said that he could sit and stand or stand and walk at least two hours. He also stated that if he was standing, he needed to sit after two hours, and if he was sitting, he needed to stand after two hours. Well, the ALJ accounted for all that by stating that Palmer can sit and stand as he needs to. That's what he offers to the vocational expert. And the vocational expert gave three different jobs with several hundred thousand jobs existing in the national economy, three different vocations, that Palmer could do within those limitations. So, again, I don't think it's correct to characterize him as saying that he gave significant weight to Dr. Porter's opinion, but then really was rejecting it. I think, again, what the ALJ was doing was taking this opinion that seemed to kind of say a couple of different things and making sense out of it based on what it actually said. And, in fact, a lot of the ALJ's physical limitations are more restrictive than any of those given by the doctors. In other words, the postural limitations, the ALJ limits him to no postural activities in several areas, and none of the doctors limited him that far. Turning to Dr. Kuruvilla's assessment, Dr. Kuruvilla is a family doctor. The ALJ was clearly more persuaded by Dr. Porter's opinion. Dr. Porter's a pain specialist, and so I don't think there's any real conflict in this case. In fact, Palmer's kind of left in this position where he's trying to say to the court, well, it's okay to accept Dr. Kuruvilla's opinion and Dr. Porter's opinion, but those opinions don't even match with each other. So why should the ALJ have to just take the most restrictive opinion and assign the most weight to it, the most restrictive opinion based on a doctor who saw Palmer only three times in early 2008, rather than accept the opinion of the doctor who saw him several times in 2009 and 2010, and many more times than Dr. Kuruvilla, and that's Dr. Porter, who's also a pain specialist, who probably has a little better idea what Palmer could actually do. So I think it's reasonable that the ALJ went along with Dr. Porter instead of Dr. Kuruvilla, and there's no way the ALJ could have accepted both opinions. They contradict each other, so. Well, you have to read them very carefully. It's not entirely clear that they're that contradictory. I agree, Your Honor. In some ways, they match each other, but in other ways, they, for example, the lifting. I find it interesting, though, that, you know, and I understand that the ALJs can do this, but it places a lot of weight on Garland, just as a record review. Dr. Garland? Right, and are you talking about the physical? Yeah. And Dr. Geary, who does a one-time. Oh, the psychological opinions. Geary and Garland. Right, and in this case, that's kind of what he was left with, because Palmer really stopped seeking treatment for psychological problems on a regular basis in the middle of 2008. In fact, he only had two appointments at about the one-year mark and then about the two-year mark after that with any psychological professional, and during those appointments, he basically told the professionals that everything was fine. He was doing well. His home life was good. He was taking care of his two young daughters, I think were age five and six at the time, at least in some cases for extended periods, and then he had his teenage son who he was kind of roughhousing with, who he seemed to have a really good relationship with. So he's reporting to these psychologists that he's doing well, and I think that's borne out by his testimony to the ALJ where he says, yeah, you know, I'm not taking my depression medication anymore, and my only real problems here are that I can't be around the public and I don't read and write very well. Now, ALJ, again, accounted for those limitations. So I think looking at the record as a whole, the ALJ really accounted for what was going on in Palmer's life, and the evidence that showed that he was more limited did not meet the statutory and regulatory 12-month rule that a disability lasts at least 12 continuous months, and as Barnhart v. Walton stated, that I stated in my brief, the focus on that is, is he prevented from work for at least 12 continuous months? And so he may have carried a diagnosis of depression or depression-like symptoms for a long time, but the limiting effect seems to be really limited to December 2007 to the middle of 2008. Your Honors, if you have no other questions, it looks like I'm out of time, so. Okay. Thank you very much. No other questions? Okay. Thank you very much. Thank you, Your Honor. Thank you. How do you respond to counsel's analysis of Dr. Abiyankar? Be more specific, please, Your Honor. He said that Dr. Abiyankar's assessment of Palmer changed over time. Very interesting what the Commissioner's counsel said. He said that it changed over time, and then he said on the same day he filled out this assessment form, the very same day that the Commissioner is relying upon the treatment note. Dr. Abiyankar gave this opinion. Let's assume there was an improvement. I'm not necessarily going to concede that, but let's assume there was improvement. Dr. Abiyankar gave the work capacities assessment on that very same day. So in spite of any improvement, Dr. Abiyankar was saying, here are the limitations that this person would have. Well, you know, I find it often very difficult to read doctors' notes. You bet. But the document that counsel pointed me to on July 31, 08, I think is the one. It was at excerpt of record 349. Again, please, on the excerpt. Excerpt of record 349. Okay. It seems to be Dr. Abiyankar's. She signed it down at the bottom, 731.08. ER 349. I am now there. Okay. So she has a statement there. He counsel pointed to the statement, unable to work the care of, I guess, the cause of. No. C slash O means complaint of. Complaint of severe back, severe. Backache. Backache. Okay. But up above, she says, two weeks ago, feeling severely depressed? Severely depressed, yes. And that he takes, what is he taking, 50? He's on methadone. And he's also taking Efexor and he's taking Seroquel, both powerful psychotropic drugs. That sure doesn't seem to support a finding of improvement. It then says suicidal thoughts. And then it says unable to work something with severe backache. Yes. That's what Judge Perez and I were just discussing. That's what counsel pointed to me, the words unable to work. Yes. Okay. So hardly, hardly a sign of improvement. But here's another thing the Commissioner's counsel said that was very important. Said it not once, but twice. Dr. Porter is a pain specialist, according to the Commissioner. And what did Dr. Porter assess? The level of Mr. Palmer's pain. And what did the vocational experts say? That those limitations would preclude work. I think the Commissioner is helping me make my case, far from detracting from it. You pointed out, Your Honor, about the PTSD. And it is in Dr. Aguirre's report where he talks about the gang activities. I saw my friends get their brains blown out, et cetera, et cetera. Considering Dr. Abiyankar's notes, they are mentioned in the ELJ decision. It's not the same as considering the doctor's assessment of work capacities. It's an extremely important distinction. Treatment records, these treatment records I think are pretty telling. Treatment records are not designed to provide work functional assessments. That's the ORN case, O-R-N. And so I think that's important. I think the mention of these medications that he's taking, he had to stop the Seroquil because it was giving him suicidal ideation. And that was in the record. But the judge cut him off when he said, Are you taking any medications? He said, Not for depression, but, and then the judge jumped in with another question, he was taking Tamazepam and Valium, which are anti-anxiety medications, which of course would dovetail with the diagnosis of anxiety going along with the PTSD. I see my time is up, and I don't want to take advantage unless the court has other questions. No, thank you very much, counsel. Palmer v. Colvin is submitted, and this session of the court is suspended.
judges: Noonan, Wardlaw, Paez